[Cite as *Riverhills Healthcare, Inc. v. Guo*, 2011-Ohio-4359.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| RIVERHILLS HEALTHCARE, INC., | : | APPEAL NO. C-100781 |
| | | TRIAL NO. A-0709850 |
| Plaintiff-Appellee, | : | |
| | | *D E C I S I O N.* |
| vs. | : | |
| Z. GEORGE GUO, M.D., | : | |
| Defendant-Appellant. | : | |

Civil Appeal From:  Hamilton County Court of Common Pleas

Judgment Appealed From Is:  Reversed and Cause Remanded

Date of Judgment Entry on Appeal:  August 31, 2011

*Dinsmore & Shohl, LLP*, *Deborah R. Lydon* and *Michael J. Mott*, for Plaintiff-Appellee,

*Frost Brown Todd LLC* and *Matthew C. Blickensderfer*, for Defendant-Appellant.

Please note:  This case has been removed from the accelerated calendar.

**DINKELACKER, Presiding Judge.**

### I. Facts and Procedure

{¶1} Plaintiff-appellee Riverhills Healthcare, Inc., ("Riverhills") filed a complaint against defendant-appellant Z. George Guo, M.D., alleging breach of an employment agreement and misappropriation of trade secrets. The trial court granted summary judgment in favor of Riverhills on both claims, and awarded it damages. Guo has filed a timely appeal from that judgment. We find merit in Guo's four assignments of error, and we reverse the trial court's judgment.

{¶2} The record shows that Riverhills is a private medical practice operating in greater Cincinnati. Guo worked at Riverhills as a neurologist from February 2006 until August 2007.

{¶3} Before that, Guo had been in a fellowship program at Ohio State University, but he had left the program for personal reasons. He worked with several search firms, one of which informed him of the position at Riverhills. At that time, Guo had no relationships with patients or physicians in the Cincinnati area. Before becoming employed at Riverhills, he had registered the internet domain name, "Medache.com" and several other similar names under his wife's name, and had renewed them annually.

{¶4} On February 10, 2006, Guo executed a renewable two-year employment agreement with Riverhills. It offered Guo the possibility of becoming a shareholder, which was expected to occur "within the second full year of employment," if he met Riverhills's standards.

{¶5} The agreement also included a covenant not to compete that applied after termination of Guo's employment with Riverhills. It prohibited Guo for a year after leaving Riverhills from practicing within five miles of any Riverhills office or

any hospital to which Riverhills admitted patients. The agreement further stated that Guo would be "relieved of this restriction only if he immediately pays to Employer, upon termination of employment, the sum of $175,000."

{¶6} Guo began practicing at Riverhills, specializing in the treatment of headaches. Riverhills had problems with his performance almost immediately. It reduced his salary on occasion due to his alleged lack of productivity.

{¶7} Guo had a number of exchanges with Dr. Thomas Frerick, Riverhills's chief operating officer, about whether Riverhills would offer Guo a shareholder agreement. On June 15, 2007, Guo sent a letter to Frerick, stating that because Riverhills was not going to offer him a shareholder agreement, it would be in everyone's best interest "not to continue my Employment Agreement."

{¶8} Several days later, Guo drew up an operating agreement for Medache, LLC, a practice specializing in the treatment of headaches that he planned to start. He obtained malpractice insurance covering the practice commencing June 18, 2007. Earlier, he had created and distributed to Riverhills's patients a business card with his personal telephone number on it.

{¶9} On June 20, 2007, Guo, while still employed at Riverhills, used his password to access Riverhills's patient databases and view patient information from his home computer for approximately four hours. Guo stated that in light of the claims about his productivity, he had run several searches in the databases to determine how many patients he had seen and how much revenue he had produced for Riverhills. He claimed that these searches had produced no data and that he had not downloaded or copied any information.

{¶10} After Riverhills learned about the searches, Frerick sent Guo a letter stating that Riverhills was terminating the employment agreement for cause. Guo left Riverhills at the end of July 2007. During the fall of 2007, he worked in various

positions, including one with another neurologist whose office was within five miles of a Riverhills office. In January 2008, within five miles of a Riverhills office, he opened Medache Clinic, which used the personal telephone number he had previously given to some of Riverhills's patients. He also practiced at a number of hospitals where Riverhills admitted patients.

{¶11} During that time, Guo saw a number of patients that he had previously seen at Riverhills. He claimed that those patients had sought him out, and he denied soliciting them in any way. He noted that Riverhills had written to his patients to inform them of his departure and had told them that they could continue to see him if they wished.

## II. Standard of Review

{¶12} Before we review Guo's five assignments of error, we must discuss our standard of review. An appellate court reviews a trial court's ruling on a motion for summary judgment de novo.[1] Summary judgment is appropriate if (1) no genuine issue of material fact exists for trial, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds can come to but one conclusion and that conclusion is adverse to the nonmoving party, who is entitled to have the evidence construed most strongly in his or her favor.[2] The trial court has an absolute duty to consider all pleadings and evidentiary material when ruling on a motion for summary judgment. It should not grant summary judgment unless the entire record shows that summary judgment is appropriate.[3]

---

[1] *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105, 1994-Ohio-336, 671 N.E.2d 241; *Brown v. Lincoln Hts.*, 1st Dist. Nos. C-100699 and C-100721, 2011-Ohio-3551, ¶7.
[2] *Temple v. Wean United, Inc.* (1977), 50 Ohio St.2d 317, 327, 364 N.E.2d 267; *Stinespring v. Natorp Garden Stores* (1998), 127 Ohio App.3d 213, 215, 711 N.E.2d 1104.
[3] *Greene v. Whiteside*, 181 Ohio App.3d 253, 2009-Ohio-741, 908 N.E.2d 975 , ¶23.

### III. Misappropriation of Trade Secrets

{¶13} In his first assignment of error, Guo contends that the trial court erred in granting summary judgment in favor of Riverhills on its claim for misappropriation of trade secrets. He argues that genuine issues of fact exist for trial. This assignment of error is well taken.

{¶14} The protection of trade secrets involves a balancing of public policies, including the protection of employers' rights in their trade secrets and the right of the individual to exploit his or her talents. Nevertheless, public policy in Ohio favors the protection of trade secrets.[4] One of the purposes of Ohio's trade-secret law is to protect an employer's investments and proprietary information.[5]

{¶15} Guo does not dispute that Riverhills's patient lists and other information were trade secrets.[6] He contends that genuine issues of material fact exist as to whether he misappropriated the trade secrets. "Misappropriation" means "[a]cquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means[,]" or "[d]isclosure or use of trade secrets of another without the express or implied consent of the other person by a person who * * * [u]sed improper means to acquire knowledge of the trade secret."[7]

{¶16} In granting summary judgment on this claim, the trial court stated, "Plaintiff has proffered evidence via affidavit and computer system printouts, establishing that in the days leading up to his departure, Defendant downloaded and copied the following: Plaintiff's referring physician list, Plaintiff's fee schedules, and Plaintiff's patient list (including names and addresses). On June 18, 2007, while still

---

[4] *Al Minor & Assoc., Inc. v. Martin*, 117 Ohio St.3d 58, 2008-Ohio-292, 881 N.E.2d 850, ¶23.
[5] *Fred Siegel Co., L.P.A. v. Arter & Hadden*, 85 Ohio St.3d 171, 183, 1999-Ohio-260, 707 N.E.2d 853.
[6] See Id. at 181-182; *Acordia of Ohio, LLC v. Fishel*, 1st Dist. No. C-100071, 2010-Ohio-6235, ¶24-29.
[7] R.C. 1333.61(B).

employed by Plaintiff, Defendant set up an operating agreement for Medache, LLC and obtained medical malpractice insurance, in preparation for his exit from Plaintiff's employ. Just days later, between June 19-23, 2007, Defendant downloaded the above-mentioned data from Plaintiff's computer system."

{¶17} The trial correctly summarized Riverhills's evidence, which showed that Guo had used improper means, specifically using his computer password for an improper purpose, to obtain Riverhills's trade secrets. But the court ignored Guo's evidence. Guo testified at his deposition that he had conducted searches using Riverhills's software system, OPUS, which he contended was an antiquated system that was difficult to use. He stated that Riverhills had repeatedly told him that he was not productive enough, so he had wanted to check its fee schedule and other information to see whether Riverhills was correct about his productivity. According to Guo, OPUS limited the user to searching by diagnosis, provider name, or patient mailing address. He testified that he tried searching using all of these parameters, but kept getting the response of "0 KB," which meant no data. He said that he did not generate any data from these searches and that he did not download or copy any information.

{¶18} Thus, Guo and Riverhills presented different versions of the facts. If we construe the evidence most strongly in Guo's favor, as we must when reviewing the trial court's decision to grant summary judgment to Riverhills, we find that genuine issues of material fact exist for trial. As this court has previously stated, "[t]his case presents a classic example of what cannot be resolved by summary judgment: namely, two different versions of a story, with the outcome dependent on credibility."[8]

{¶19} Riverhills points out that Guo also admitted that he had viewed patient information and fee schedules. Specifically, he admitted that he had looked at "the

---

[8] *Greene*, supra, at ¶24, quoting *Wygant v. Continental Ins. Agency* (Jan. 22, 1999), 1st Dist. No. C-980012.

patients associated with his name," and that he may have seen information concerning other doctors' headache patients.

{¶20} Nevertheless, these admissions did not negate all of his testimony. Information does not lose its character as a trade secret if it has been memorized.[9] But Guo stated only that he had seen the information, not that he had memorized it. Further, Dr. Frerick acknowledged that when he had confronted Guo about downloading information, Guo had "maintained that he did not take that information with him, but there was no way to know whether he did or not."

{¶21} Consequently, we hold that the trial court erred in granting summary judgment in favor of Riverhills on its claim for misappropriation of trade secrets. We sustain Guo's first assignment of error.

### IV. Breach of Contract/Noncompete Clause

{¶22} In his second assignment of error, Guo contends that the trial court erred in granting summary judgment on his claim for breach of contract. He first contends that the covenant not to compete contained in his employment agreement with Riverhills was not enforceable because it was a severe restriction on his ability to practice medicine and was injurious to the public. We disagree.

### A. Noncompete Clause was Reasonable

{¶23} A court may enforce a noncompetition clause in an employment agreement only to the extent that it is reasonable.[10] Such a clause is reasonable if the restraint (1) is no greater than is required for the protection of the employer; (2) does not impose undue hardship on the employee, and (3) is not injurious to the public.[11]

---

[9] *Al Minor & Assoc.*, supra, at paragraph one of the syllabus.
[10] *Harris v. Univ. Hosp. of Cleveland*, 8th Dist. Nos. 76724 and 76785, 2002-Ohio-983.
[11] *Raimonde v. Van Vlerah* (1975), 42 Ohio St.2d 21, 325 N.E.2d 544, paragraph two of the syllabus; *Harris,* supra; *Ohio Urology, Inc. v. Poll* (1991), 72 Ohio App.3d 446, 452, 594 N.E.2d 1027.

Courts must strictly construe noncompete agreements in favor of professional mobility and access to medical care and facilities.[12] Nevertheless, each case must be decided on its own facts.[13]

{¶24} The noncompete clause in this case applied for a year and stated that Guo could not provide services at a location within five miles of any of Riverhills's offices or at a hospital or health care facility that admitted Riverhills's patients. We hold that this clause was reasonable as a matter of law. It left Guo with a number of communities in greater Cincinnati where he could have practiced medicine and several area hospitals where he could have admitted patients.[14] Thus the trial court was correct in finding that the noncompete clause was reasonable.

### B. Construction of Noncompete Clause

{¶25} Guo next argues that the covenant not to compete was extinguished by his termination of the employment agreement for cause. In the construction of a written instrument, a court's primary objective is to give effect to the parties' intent, which can be found in the language they chose to use. The court will read the writing as a whole and gather the intent of each part from a consideration of the whole.[15]

{¶26} The interpretation of a written instrument is, in the first instance, a matter of law for the court. If it is clear and unambiguous, the court need not go beyond the plain language of the agreement to determine the parties' rights and obligations. Instead, the court must give effect to the contractual language.[16] But if the provisions of

---

[12] *Sammarco v. Ctr. for Othopaedic Care* (1938), 131 Ohio App.3d 544, 551, 723 N.E.2d 128, overruled on other grounds in *Littlejohn v. Parrish*, 163 Ohio App.3d 456, 462, 2005-Ohio-4850, 839 N.E.2d 49; *Ohio Urology*, supra, at 453.

[13] *Raimonde*, supra, at 25; *Harris,* supra.

[14] See *Wall v. Firelands Radiology, Inc.* (1995), 106 Ohio App.3d 313, 333-334, 666 N.E.2d 235; *Holzer Clinic, Inc., v. Simpson* (Apr. 28, 1998), 4th Dist. No. 97CA9.

[15] *Foster Wheeler Envirespouse, Inc. v. Franklin Cty. Convention Facilities Auth.,* 78 Ohio St.3d 353, 361, 1997-Ohio-202, 678 N.E.2d 519; *Fifth Third Bank v. Ducru Ltd. Partnership*, 1st Dist. No. C-050564, 2006-Ohio-3860, ¶13.

[16] *Aultman Hosp. Assn. v. Community Mut. Ins. Co.* (1989), 46 Ohio St.3d 51, 53, 544 N.E.2d 920; *Blair v. McDonagh*, 177 Ohio App.3d 262, 2008-Ohio-3698, 894 N.E.2d 377, ¶48.

a contract are ambiguous, an issue of fact exists, making summary judgment inappropriate.[17]

{¶27}  The last sentence of Section 9.3 of Guo's employment agreement, the noncompete clause, states, "Physician will be relieved of this restriction if Physician terminates for cause under the Provisions of Section 7.6."  This sentence was not originally in the agreement.  Guo negotiated to have it included.

{¶28}  Section 7.6 states, "Notwithstanding any term of this Agreement to the contrary, Physician may terminate this Agreement immediately upon giving Employer written notice in the event that * * * the physician is not offered a Shareholder Agreement according to Section 5.7."

{¶29}  Section 5.7 provides that the employer will periodically review the physician's performance and, if the physician's job performance satisfies the employer's criteria for becoming a shareholder, the "Employer intends to offer Physician the opportunity to enter into an employment agreement * * * on the same terms and conditions as Employer's shareholder-employees."  No set time period was specified.  The agreement only stated that "Employer expects that this will occur within the second full year of employment."

{¶30}  Guo contends that he invoked Section 7.6 in his letter dated June 15, 2007, in which he terminated the employment agreement because Riverhills was not going to offer him a shareholder agreement.  What actually occurred is a bit more complex.

{¶31}  The record shows the following sequence of events:  On May 31, 2007, Frerick and other Riverhills employees met with Guo to discuss his ongoing problems with recordkeeping and coding issues.  On June 15, 2007, Guo sent Frerick a letter,

---

[17] *Inland Refuse Transfer Co. v. Browning-Ferris Indus. of Ohio, Inc.* (1984), 15 Ohio St.3d 321, 322, 474 N.E.2d 271; *Blair*, supra, at ¶48; *Fifth Third*, supra, at ¶14.

stating, "It has led me to a conclusion based on several discussions between you and me recently that Riverhills Healthcare will not offer me a share-holder physician status in the future. It is my belief that it will be in the best and mutual interests not to continue my Employment Agreement with Riverhills Healthcare for the reason mentioned above." Frerick testified that "[a]lthough Guo had serious performance problems at the time," Riverhills had not, as of that date, "provided any written notice to him concerning whether or not he could be offered the opportunity to become a shareholder[.]"

{¶32} On June 18, 2007, Frerick sent Guo a letter memorializing the May 31, 2007, meeting. It stated that "Riverhills prefers not to pursue dismissal 'for cause' from the practice and would prefer to meet with [Guo] and determine an amicable schedule for exiting the practice."

{¶33} On July 13, 2007, Frerick sent a memorandum to Guo regarding "2nd Modification to Your Employment agreement and Resignation from Riverhills Healthcare." It stated, "by signing this agreement you voluntarily resign from Riverhills Healthcare, and my signature indicates acceptance of your resignation. The effective date of your resignation is July 31, 2007." Guo refused to sign this memorandum.

{¶34} Finally, on July 31, 2007, Frerick sent Guo a memorandum regarding "Termination for Cause." It stated, "Riverhills Healthcare, Inc. is terminating your Physician Employment Agreement for cause effective Aug. 31, 2007 per paragraph 7.3j of the agreement[.]" It listed a number of reasons, including "[t]heft of Riverhills' patients' names and addresses."

{¶35} Riverhills contends that its evidence showed that no decision was actually made about Guo's shareholder status prior to Guo's June 15 letter. But the agreement does not specify any time period during which Riverhills must have offered Guo a shareholder agreement. Thus, it is ambiguous on that point. According to Guo, Frerick told him on several occasions that Riverhills was not going to offer him a

shareholder's agreement. Whether those oral discussions were sufficient to allow Guo to terminate the agreement under Section 7.6 presented a genuine issue of material fact. Therefore, the trial court erred in granting summary judgment in favor of Riverhills on its breach-of-contract claim, and we sustain Guo's second assignment of error.

### *V. Assignments of Error on Damages*

{¶36} In his third and fourth assignments of error, Guo takes issue with the amount of damages awarded by the trial court following its decision to grant summary judgment to Riverhills on both of its claims. Since we have held that the trial court erred in granting summary judgment to Riverhills on those claims, any award of damages was also erroneous. Consequently, we sustain Guo's third and fourth assignments of error, reverse the trial court's judgment in its entirety, and remand the case to the trial court for further proceedings consistent with this decision.

Judgment reversed and cause remanded.

**HILDEBRANDT** and **CUNNINGHAM, JJ.,** concur.

Please Note:
 The court has recorded its own entry this date.